# Richmond

GUY BRUMLEY AND M. L. CAPPS v. C. W. GRIMSTEAD.

April 28, 1938.

Present, All the Justices.

The opinion states the case.

*W. R. Ashburn,* for the appellants.

*Braden Vandeventer* and *James G. Martin & Son,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

The plaintiffs in error, Guy Brumley and M. L. Capps, hereinafter referred to as the plaintiffs, separately filed in the Circuit Court of Princess Anne county, their respective petitions or bills for an adjudication of rights in the nature of a declaratory judgment. Virginia Code 1936, sections 6140a to 6140h, inclusive. The validity of licenses issued for the location of stake or brush blinds to shoot migratory waterfowl, and the priority of rights to the locations described in the licenses, are brought into question.

The two cases, by consent of all parties, were heard and considered together. Separate answers were filed by the

defendant, C. W. Grimstead, and the evidence was heard *ore tenus,* with the exception of one deposition.

The trial court upheld the validity of the license issued to the defendant, ordered that the plaintiffs remove their blinds from within five hundred yards of the location of the defendant's blind, and dismissed the petitions or bills. From the action of the trial court, in refusing to uphold the validity of their licenses and in directing them to remove their blinds, the plaintiffs have taken this appeal.

The General Assembly of Virginia has by statute undertaken to limit the methods by which migratory waterfowl may be hunted in the Back Bay area in Princess Anne county. (The Game, Inland Fish and Dog Code, Virginia Code 1936, ch. 130, section 3305(1) *et seq.*). It is provided that, within the said area, migratory waterfowl may be hunted only from batteries, brush or stake blinds, mat blinds and blinds on shore. Batteries having been prohibited by Federal regulations, only blinds were permissible in 1936. To favor the owners of the shores bordering on the public waters in the choice of location along their shore lines, they were given the privilege to procure shore or stationary blind licenses between July 1st and August 31st, inclusive, of each year. Locations in the public waters adjacent to any shore line not so licensed were declared to be open for license for brush or stake blinds, in accordance with the following provisions:

Subsection (19c), clause (f). " * * * Licenses for brush or stake blinds may be obtained on and after August thirty-first, and on and before September thirtieth, and a stake or blind shall be erected on the site, with the metal license plate supplied with license for that season affixed thereto within ten days, but no brush or stake blind shall be licensed within five hundred yards of any other licensed blind; * * * ." Code 1936, section 3305(19c), cl. (f).

The statutes restrict the issue of brush or stake licenses to residents of the Commonwealth, and limit the number to not more than two for each resident. It provides that the holders of the licenses first issued may renew the same

privileges for each succeeding year by annually licensing their device within the time required, subject to the right of the shore line owners to license points each year.

The manner of obtaining the licenses is provided for in subsection (19c), clause (i):

"Application for blind licenses under this Act shall be made to the clerk of the circuit court of Princess Anne county, who shall be paid similar fees as for issuing hunting licenses. With each license the clerk shall deliver a metal license plate bearing the same number as the license, which shall be affixed to the blind where it may be easily observed. Should there be two or more applications at the same time for approximately the same location, preference shall be given to the applicant residing nearest the desired location. The commission shall furnish application blanks, licenses and license plates provided for in this section." Code 1936, section 3305(19c), cl. (i).

M. L. Capps went to the office of the clerk of the Circuit Court of Princess Anne county, on Saturday, August 29, 1936, to inquire as to the method and steps necessary to procure a brush blind license. He states that he was informed by the clerk on that day, in the clerk's office, that such licenses were not issuable until August 31st, and was advised to return to the clerk's office at 9:00 a. m. on the latter date, where the rule "first come, first served," would prevail. This information, heard by others, apparently was later communicated to a number of persons, not present, including Guy Brumley, who resided about twenty miles from the court house.

On Monday, August 31, 1936, the first day on which such blind licenses could be issued, Capps arrived at the clerk's office at sunrise, and was soon followed by Brumley, who arrived when the sun was about half an hour high. A number of other persons also desiring to secure similar licenses, arrived before the opening of the clerk's office, and there waited until the arrival of the clerk of the court. The clerk arrived at 9:00 a. m. and opened his office. He then advised the waiting applicants that prior to the opening

of his office, and at his residence about seven miles from the court house, he had since the preceding midnight, already issued twenty-three licenses for similar devices, and that subsequent applications would be subject to those already issued.

Grimstead, also desiring a license, went to the court house about 7:00 o'clock on the morning of August 31st. He found a number of persons already there for the same purpose. Someone circulated a report that licenses could be gotten from the clerk at his home. Grimstead with two others went to the clerk's home, arriving at about 8:00 a. m. He found sixteen licenses already had been issued. One of the companions of Grimstead procured licenses numbered 17 and 18, and Grimstead received licenses numbered 19 and 20. There was no prearrangement between Grimstead and the clerk with reference to securing the licenses that morning.

Grimstead's application was for "one stake blind in South end of Back Bay between Egg Island Point and Oyster Cove." License number 19, the one in question here, called for that location. He also then secured license number 20, for another location.

At the clerk's office after it opened at 9:00 o'clock a. m., Capps made application for two licenses, one for a brush blind "to be located approximately one hundred yards southwardly of Egg Island Point." For this location, which is in question here, he received license number 34. He also got a second license for another location. Capps saw the Grimstead application, so he knew the description contained in the latter's license.

Brumley also applied at the clerk's office on the same day, after 9:00 a. m., and at first secured one license number 39, for a location not in question here. After getting the first license, he left the clerk's office, but shortly thereafter returned and made application for a second license, describing the location as "for one stake blind running seven hundred yards from Bull's Bay Bulkhead direction of Egg Island Point, on west by Malbon's Island and on

east by Knott's Island." The location for this latter license number 32, is in controversy. Brumley says that he did not apply first for the last mentioned location because he thought Grimstead had a license which covered that location, but later deciding that he lived nearer to the desired location than did Grimstead, he returned and applied for it.

Capps and Brumley went on the same day to the locations, which they considered as the sites described in their applications, and there respectively affixed to driven stakes the metal license tags which each had received.

About five days after Grimstead had received his license, he went to the area in question, drove a stake, and affixed thereto the metal tag. The location selected by him was about half way between Egg Island Point on the north and Oyster Point on the south, being, therefore, slightly over five hundred yards from either shore. The location was between the sites selected by Capps and Brumley, and less than five hundred yards from each of their sites.

The clerk of the court, who testified by deposition, admitted that shortly after 12:00 o'clock midnight on Sunday, August 30th, and early in the morning of the 31st, he had issued stake or brush blind licenses to all who applied therefor. He explained that he had had a number of calls for "point" or shore licenses the preceding days after office hours, and that in order to accommodate the applicants for licenses, and to avoid the necessity of having to go to the clerk's office he had carried the blank licenses to his home. He further stated that it had been the practice of himself and his deputies to accommodate persons wishing to secure ordinary hunting licenses or marriage licenses by receiving such applications and issuing such licenses at their homes, at any time after office hours, and sometimes on Sundays, and between the hours of 2:00, 3:00 and 4:00 o'clock in the morning.

The clerk disclaimed any arrangement with anyone to secure stake or brush licenses at his home. He says that he issued the licenses to each applicant for whatever location he selected, as he had no idea of the locations or gen-

eral circumstances in the area affected; that he told applicants that they could apply for any location they wanted and that he would grant anyone that they applied for, as he "had no map and knew nothing in the world about Back Bay," or whether the proposed locations were five hundred yards or two miles apart; that he did not inquire as to whether there was any conflict in the locations, and all he did was to sign his name to the license for the location asked for, and hand out the license and metal plates. He refused to deny that he had made the statement that none of the above licenses were to be issued until 9:00 a. m. at the clerk's office on August 31st, but said that he did not recall that he had made such a statement.

Egg Island Point and Oyster Cove are places on opposite shores at the south end of Back Bay. There is about eleven hundred yards of public water between the shores. The shore on either side had not been licensed by the owners thereof on August 31st, thereby leaving open any spot within the space of eleven hundred yards for entry on that day.

Grimstead contends that his stake blind was to be located in the approximate center of the area mentioned. In the event that in the succeeding years any of the respective adjoining landowners should license a stationary blind, the center of the line between Egg Island Point and Oyster Cove would be the only available place five hundred yards from a stationary blind. The cove in question only admitted of having one brush or stake blind, if that one was placed in the center.

It is conceded that Brumley lives nearer the location selected by Grimstead than does Grimstead, but it is denied that Capps lives nearer than Grimstead.

The location of the present stakes of the three parties is such that Capps and Brumley are more than five hundred yards from each other, but each of them is closer than five hundred yards to Grimstead. The questions involved are: First, is the license of Grimstead valid for the location selected by him at a point approximately half way between

Egg Island Point and Oyster Cove? Second, if the license of Grimstead is invalid, are the licenses of Capps and Brumley valid for the locations at which they placed their stakes? Who has the prior right to the conflicting locations?

The plaintiffs contend first, that the clerk of court had no legal authority to issue licenses of the nature herein from his home before the opening of his public office on the first day on which, under the law, such licenses were procurable, and that licenses so issued are invalid; second, that the license of Grimstead was too indefinite as to location to confer any rights in him to the site which he selected; and third, that because all of the licenses were issued on the same day, they must be regarded as applied for at the same time, and the plaintiffs' applications should have been preferred because they reside nearer the proposed location than does Grimstead.

Grimstead contends that he has a valid license, which was properly issued prior to those of the plaintiffs; that the plaintiffs do not come into equity with clean hands, because they have purchased the licenses for the benefit of non-residents, who are prohibited by law from securing same; and that the licenses of the plaintiffs are void for lack of definite description of location.

The general policy of the law is that public business is to be transacted at the public office. This, we think, is shown by the provisions of sections 3385, 3386 and 3388 of Virginia Code 1936, which respectively provide for the location of the clerk's office, for the filing and preservation of the public records, and that the said office, with the exception of certain holidays, shall be kept open every day, "during convenient hours, for the transaction of business."

We are aware that it has long been the custom of the clerks of courts, especially in the country districts, to transact much public business outside of office hours, and away from their public offices. Such practice has proved to be of great convenience in the issuance of marriage licenses, and hunting and fishing licenses. We do not find

any statute in Virginia prohibiting the clerk from transacting official business outside of his usual hours, or outside of his office. In the issuance of marriage, hunting and fishing licenses, ordinarily, only the applicants on the one part and the Commonwealth on the other are interested. All that the clerk has to do is to ascertain whether the applicants come within the general requirements prescribed by law. In such cases, we find no expression of legislative intendment that an equal opportunity is to be offered to those applying for such licenses, or that any distinction is to be made as between those applying for a similar license at the same time. There is no limitation or restriction relative to the enjoyment of the privileges conferred, or as to the location for the exercise of the privilege.

Some courts in other States have held that clerks of courts may legally perform certain duties outside of their offices and after office hours. In none of the cases cited by the defendant are the law and the facts the same as in this case. The cited cases were not decided under any statute undertaking to provide an equal opportunity between citizens to acquire a privilege, right or franchise granted by law.

■ The legislature of Virginia, in its wisdom, has reserved the rights in question here to residents of the Commonwealth. As between residents, diligence has been made a factor in the securing of priority of rights. Between equally diligent applicants preference is granted on proximity of residence. But it is apparent that equality of opportunity is sought to be given to citizens of the same classification. The intention to grant equality of opportunity to eligible applicants to avail themselves of the privilege therein provided, may be gathered from the entire act and especially from subsection (19c), clauses (f) and (i). Code 1936, section 3305(19c), cls. (f), (i). A dead line between August 31st and September 30th is set, within which the opportunity may be exercised. Second, it is provided, "Should there be two or more applications at the same time for approximately the same location, preference shall be given to the applicant residing nearest the

desired location;" and third, Code, section 3388, provides that the clerk's office shall be kept open "during convenient hours, for the transaction of business."

The agency issuing the license is a State agency. While not required by statute to be kept open during specified hours, the office hours for the transaction of business shall be "during convenient hours." It can hardly be seriously contended that the hours between 12:00 midnight and 8:00 o'clock a. m. may be considered convenient, either for the great majority of persons having business to transact at that office, or for the employees of the office.

The privilege which the statute authorizes to be granted is a State favor, not to a personally selected list of citizens, but available to all citizens coming within its classification and complying with its provisions. The statute seeks to provide equal opportunity to those who are entitled to its benefits, and desire to receive the favor from the hands of the government. This spirit embodies the underlying principles of a democratic government established to secure equal rights and to prevent special favors. All of this the General Assembly knew. It cannot be conceived that it ever contemplated that the provisions of the statute should be so construed that an official of the State could so arrange his hours of public duty, either with or without the performance of extra labor, as to create a situation which could permit him to grant a privilege or franchise from the State to one person, and deny it to another equally entitled thereto.

While there is no evidence that any sinister, ulterior or improper motive moved the clerk of the court in this case, the result of his action is promotive of unfairness and injustice. The possibility of an unfair exercise of the power sought by the defendant in the hands of an unscrupulous person, is so great as to repel any implication that its granting was intended.

We are all agreed that the government should be conducted in a fair and orderly way. Equal notice and equal opportunity ought to be given to those who have the right

of competition. It is a violation of the spirit of the statute under review to permit a public officer to transact public business outside of his usual and convenient hours, so that among those entitled to an equal opportunity, one or more shall receive preferential treatment. It will, perhaps, be admitted that one can not require a clerk of court to perform a public service outside of the convenient hours adopted for the transaction of business and outside of his office. It ought not, therefore, to be left to the public official to voluntarily assume such responsibility, especially when the rights of others are affected thereby.

Grimstead applied for a license for "one stake blind in the South end of Back Bay, between Egg Island Point and Oyster Cove." The distance between Egg Island Point and Oyster Cove is estimated to be about eleven hundred yards. Both the license and the application failed to designate any location between the points. Grimstead might have selected any point within several hundred yards of the point where he actually placed his stake.

We think that clauses (f) and (i) of subsection (19c) contemplate that the description of the location should be so definite that other applicants would be put on notice so that they would know that the area within a distance of five hundred yards from the special point was not open to entry. Otherwise, the clerk would not be sufficiently informed to refuse a subsequent license for the same place. Nor do we think that one can secure a permit with an indefinite location, and compel others to wait until the expiration of a ten day period, until he decides on his exact point of location, before others can be sure that the location desired by them is five hundred yards therefrom.

It is true that the statute does not require a survey to be made; but there should be a description of the location in such a manner and with such particularity as will identify it to an average person.

Capps' application was for a blind to be located approximately southwardly of Egg Island Point. His license read "Waterfowl stake or brush blind, $15.00." This descrip-

tion is equally indefinite. It could mean anywhere between southeast and southwest, or a variance of ninety degrees, which would make a considerable distance, and might amount to a difference of as much as one hundred yards.

Brumley's application was for "one stake or brush blind running seven hundred yards from Bull's Bay Bulkhead, direction of Egg Island Point, on west by Malbon's Island and on east by Knott's Island."

The evidence was that Bull's Bay Bulkhead is one hundred yards long. The description of the location does not say whether the starting point is taken at the eastern end or the western end of the bulkhead. The difference between th points is manifest. The plat shows that Malbon's Island bounds the whole west side of the cove, and that Knott's Island bounds almost all of the eastern side.

We conclude that none of the applications or the licenses contain descriptions sufficiently definite to show a fixed location. The description contained in each is such as to leave the site of the location to the determination of the owner of the permit after its issuance. This is plainly not the intention of the makers of the statute, or of the statute itself.

 In the view that we take of this case, it is hardly necessary to consider the third contention of the plaintiffs. It is true that as a general rule the law does not separate the parts of a day, and, therefore, will not take cognizance of fractions thereof; but even this principle is subject to departure therefrom to promote right and the ends of justice. Suffice it to say that we do not think the rule of the general principle is involved in this case. The use of the words "at the same time" in clause (i) of subsection (19c) makes it rather clear from the context that the provision applies where two or more persons have "applications" for approximately the same location, pending for consideration during the particular time or period when consideration is being given to the application for that location. The use of the word "applications" instead of the word "applicants" indicates that "applications" may be made and filed before

August 31st, and be ready for consideration when the time arrives on August 31st for issuance of licenses.

All three of the parties to this proceeding are professional guides. Capps was employed by a club, all of whose members were non-residents. He admits that he bought his licenses with money furnished to him by members of the club. Brumley was employed by the owner of a club, who was a non-resident. It appears from the evidence, although Brumley does not so admit, that his employer either furnished him with the money, or was expected to refund it. Grimstead was a guide and duck hunter on his own account. All three parties were naturally very much interested in securing locations where they could exercise their talents, and secure work and compensation. A good location was of some value to each of them. The plaintiffs testify that a license for the privilege of hunting at each of the locations claimed by them, is of the value of $500 or more.

The statute does not prohibit residents from securing licenses by the payment of funds received from a non-resident. It does limit the number of licenses which a resident may acquire to two. The limitation would seem to preserve the rights of other residents, within the spirit and letter of the statute.

The defendant has filed a motion to dismiss the appeal on the grounds that this is not a controversy involving $300 in value, or otherwise appealable, and that the appeal bond was never given with any proper principal.

It appears that the motion for dismissal was not made in good time. The appeal bond was given on October 19, 1937, about two months before the expiration of the six months period in which it could have been given. Objection thereto was not brought to the attention of counsel for the plaintiffs until March 2, 1938, and the motion was not filed in this court until March 7th, four days before the case was reached for argument. We have held in several cases that a defect in an appeal bond is waived by failure to make a motion for dismissal before the expiration of the

time within which a new bond can be given. *Trust Company of Norfolk* v. *Fletcher,* 152 Va. 868, 148 S. E. 785, 73 A. L. R. 1111; *Northern Neck, etc., Ass'n* v. *Turlington,* 136 Va. 44, 116 S. E. 363; *Virginia Fire, etc., Ins. Company* v. *N. Y. Carousal Mfg. Company,* 95 Va. 515, 28 S. E. 888, 40 A. L. R. 237.

The motion may, however, be disposed of on its merits.

While a specific amount is not in controversy, the value of the right in question is shown by the evidence to have a value beyond the sum of $300. Regardless of the value or amount involved, we conclude that there is drawn into controversy the right of a franchise as defined in Virginia Code 1936, section 6337. This section and the preceding section authorize an appeal from a final judgment or decree when there is drawn into question a franchise.

A franchise is a particular right or privilege conferred by the government upon a citizen to do and perform certain acts, which, without such grant, could not be performed. 3 Words and Phrases, First Series, Franchise, page 2930. The privilege granted by the licenses in question comes within that definition.

The appeal bond is in the form containing the usual provisions. The first words of its recital are: "KNOW ALL MEN BY THESE PRESENTS, That we W. R. Ashburn, for Guy Brumley and M. L. Capps, Principal and Roy Smith, surety are held and firmly bound," etc. It is signed "W. R. Ashburn, for Guy Brumley & M. L. Capps." The clerk of the circuit court of Princess Anne county has certified on the back thereof as follows: " * * * I do further certify that the language 'for M. L. Capps & Guy Brumley' appearing after the signature of W. R. Ashburn as principal on said bond was added after the signature was made at my suggestion to conform to the body of the bond where such language had been incorporated for the purpose of identifying the parties litigant for whose benefit the said bond had been made—"

An inspection of the signatures on the certified copy shows that the word "for" appears on the same line as the

name "W. R. Ashburn," and the names "Guy Brumley & M. L. Capps" appear in smaller writing beneath the name of Mr. Ashburn.

The defendant contends that the attorney for the plaintiffs, W. R. Ashburn, had no authority, under seal, to execute the bond for the plaintiffs. The plaintiffs, by this same attorney, assert that the bond shows on its face that it is the obligation of W. R. Ashburn, as principal, and deny that there was any attempt or intention to execute the bond as a bond of Brumley and Capps, principals.

Code, section 6351, provides that the bond may be given by one or more of the appellants or petitioners or "some other person." Undoubtedly, Mr. Ashburn could give the bond in his own name for, on behalf of, or in the place and stead of the plaintiffs. Where such a bond is given by "some other person" than the litigant, it is given for, or on behalf of the litigant in order to preserve the right of appeal to the litigant. The word "principal" in the first sentence in the bond is in the singular, and as such is descriptive of Ashburn and not of the two persons, Brumley and Capps. The word "for," in the connection here used, was intended to identify the parties litigant, "for" whose benefit the bond was made. So it was clearly understood both by the person giving the bond and the officer who took it.

The facts and circumstances are unlike the case of *Forrest* v. *Hawkins & Windholz, etc.,* 169 Va. 470, 194 S. E. 721. There is no claim of agency here. We have here the substitution of one principal for another who might have been a principal. There is no evidence that Ashburn was authorized to act as an agent in signing the names of his clients as principals in the bond. His employment merely as counsel did not authorize the exercise of a bond binding the plaintiffs. The plaintiffs are not bound on the bond. The person who undertook to act as "some other person" for the litigants is bound. The presumption is that a person acts for himself and not as the agent of another. *Montague Mfg. Company* v. *Aycock-Holly Lumber Company,* 139 Va. 742, 124 S. E. 208.

 In *Early* v. *Wilkinson*, 9 Gratt. (50 Va.) 68, it was held that where the signature on a note presented a question as to who was intended to be bound, parol testimony and surrounding circumstances were admissible to show the true facts. When a writing is ambiguous, the intention of the parties, their dealings with each other, and the peculiar facts surrounding each particular case, are determinative of the question. Lile's notes to 1 Minor's Institutes (4th Ed.) 1899, 99, 101.

There is no merit in the motion to dismiss.

 The purpose of this proceeding was to secure an adjudication of rights between the parties, and consequential relief. Plaintiffs had a right to apply for licenses for locations desired by them, unless the license for the location claimed by Grimstead was valid and prior to their rights. It is apparent that each of the parties has a real interest in the privilege or franchise sought, and that doubt or uncertainty has arisen in the attempt to exercise their alleged rights. An "actual controversy" has arisen both as to the interpretation and administration of the statute under which the right could be conferred, as well as to the location of the specific territory wherein the right might be properly exercised.

 We conclude, for the reasons hereinbefore given, that while Grimstead had a right to apply for a license for a brush or stake blind at a definite location, if the same was open for license, the application should have been made in the clerk's office during the "reasonable hours" the office was required by law to be kept open for public business. The application for the license should have described the location in such definite and specific language as to have made the location readily ascertainable by the clerk of courts, the applicant, and any other interested applicants. The time and manner of granting Grimstead's license and the description of a location therein, conform to neither of these requirements. It is, therefore, invalid.

 Nor are the descriptions contained in the applications and licenses of either Capps or Brumley sufficiently

definite as accurately to determine the locations sought by them. Both are invalid and void. Each had a right to apply for a definite location in the area described, in the absence of the assignment of another location within five hundred yards thereof, but the right was required to be exercised in accordance with the law. This they failed to do.

The record is not clear and satisfactory as to whether Capps resided nearer to the location claimed by Grimstead than Grimstead. This question, if it again arises, is left open for future determination, when hunting locations may be sought in the area affected for the next hunting season.

The judgment and decree of the trial court is reversed. The facts before us being sufficient to enable us to attain the ends of justice, we will enter a decree here adjudging that the stake or blind licenses issued to each of the parties by the clerk of the Circuit Court of Princess Anne county, for hunting locations in the waters of Back Bay area of that county, numbered, respectively, 19 in the name of C. W. Grimstead, 32 in the name of M. L. Capps, and 34 in the name of Guy Brumley, are null and void.

If the area in question is left open to location for stake or brush blinds therein during the next period of time when applications for location therein may be made, licenses therefor may be issued in accordance with the views expressed in this opinion, and in accordance with the statutes now regulating same, or any amendments thereto.

The plaintiffs substantially prevailing, it is ordered and decreed that the costs of this proceeding, including the costs in the trial court, shall be paid by the defendant.

*Reversed.*