## Richmond

RAY T. AVERY, JOHN W. AVERY, AND E. FLOYD
YATES v. C. W. BEALE.

March 15, 1954.

Record No. 4159.

Present, All the Justices.

The opinion states the case.

*Edward P. Simpkins, Jr., Robert Lewis Young* and *Bremner & Young*, for the appellants.

*George E. Haw* and *Haw & Haw*, for the appellee.

SMITH, J., delivered the opinion of the court.

This case involves the validity of certain duck blind licenses and the priority of rights as between riparian and non-riparian licensees.

On November 13, 1952, the appellee, C. W. Beale, presented his sworn bill of complaint, together with affidavits and exhibits, to the judge designate of the Circuit Court of Charles City county, alleging that the appellants, Ray T. Avery, John W. Avery and E. Floyd Yates were hunting from a stationary duck blind located in the public waters of the Chickahominy river in violation of his rights acquired under Title 29, Chapter 5, Article 3, of the Code of 1950, sometimes herein referred to as duck blind statutes. The

prayer of the bill was for an injunction which was that day granted and under which the appellants were enjoined from using their blind for a period of ninety days therefrom, appellee and his surety executing bond in the penal sum of $5.00. In their joint and several answer, appellants, (Ray T. Avery, licensee of a duck blind here involved, and his two guests), denied that they were violating any of appellee's rights, and asserted that the duck blind statutes are unconstitutional so far as they purport to grant a preference to the riparian owner. Ray T. Avery, in addition to his answer, filed a cross bill praying that the appellee be enjoined from interfering with the use of his blind and that he be awarded damages for being denied the use of his blind during the effective period of the injunction. On December 15, 1952, the cause came on to be heard *ore tenus* and the trial court made the injunction of November 13, 1952, perpetual for the 1952-53 hunting season and ordered Ray T. Avery to remove his blind within five days, to which action of the trial court this appeal was awarded the appellants.

At the outset we are met with a motion to dismiss this appeal because "there is now no question in controversy between these parties; that it is entirely a moot question, and regardless of whether the Court should hold that the statute in question is constitutional or not, cannot in any wise affect the rights of the parties in this suit as regards the hunting season of 1952-53, which has already ended and the license for same has expired."

To support this motion, the appellee relies on *Hankins* v. *Town of Virginia Beach*, 182 Va. 642, 29 S. E. (2d) 831, which involved the right of certain individuals to operate their vehicles for hire on the streets of the Town of Virginia Beach under a license issued to them by the town. The case was dismissed because the particular license had already expired and all rights and benefits thereunder had ended. Here, however, while the hunting season of 1952-53 has ended, the right to damages "by reason of the institution of

this suit and the loss of this defendant's hunting privileges," as asserted by Ray T. Avery in his cross bill, is not moot but dependent on the correctness of the trial court's final judgment. *Goin* v. *Absher*, 189 Va. 372, 53 S. E. (2d) 50. There is therefore no merit in this contention and the motion to dismiss this appeal is overruled.

Eagle Lodge, Incorporated, a corporation owned entirely by appellee, is the owner of a large tract of land of approximately 1,100 acres in Charles City county, Virginia, with a frontage of two and a half to three miles on the west bank of the Chickahominy river, a tidal and navigable stream. Between the channel of the river and the shore line of the Eagle Lodge property there is a pronounced indenture or bay known in that vicinity as Carys Flats which is a very desirable place to hunt waterfowl.

On July 1, 1952, appellant Ray T. Avery obtained license no. 16, and a license plate for a stationary blind, described in his application as being in the "public waters opposite lower buoy in Carys Flats." He had held a valid license for the same blind the previous hunting season, 1951-52. Immediately after obtaining the license plate he affixed it to his blind which had already been erected within 500 yards of the Eagle Lodge property, but more than 500 yards from any other then licensed blind.

Thereafter, but prior to September 1, 1952, Beale, as permitee of Eagle Lodge, Incorporated, obtained sixteen licenses for duck blinds on or in front of the Eagle Lodge property for the use of himself and his guests. The location designated in the application for one of these licenses, no. 18, was in the "lower part of Carys Flats approximately opposite buoy in river channel, 500 yards more or less from Charles. City shore line," which blind was built in the public waters in front of the Eagle Lodge property and west of the channel and within 32 yards of the blind erected by appellant Ray T. Avery. The appellee's application for another license, no. 32, described the location of the blind as "on shore at or near up or down river from Goose Point,"

which blind was built on the shore line of the Eagle Lodge property between high and low watermarks, and within 500 yards of Avery's blind. The license plates for these two licenses were affixed and the blinds built within the time required to give the riparian owner priority under the terms of the duck blind statutes.

This brings us to the issues of the case, which are thus stated by appellants: "If Title 29, Chapter 5, Article 3, of the Code of Virginia, 1950, be properly interpreted as conferring upon the appellee under the circumstances of this case any rights superior to the rights of the appellant, Ray T. Avery, under license No. 16, then such statutes are void in the particulars mentioned under * * * Article 1 of the Fourteenth Amendment to the Constitution of the United States, and Sections 1, 3, 4, 11 and 63, Paragraph 18, of the Constitution of Virginia, particularly as made statutory by Section 62-1, Code of Virginia, 1950," and that said Article 3, "insofar as it might be interpreted to confer rights of priority upon the appellee in this case, the provisions thereof being vague, contradictory and unworkable, is void."

In 1916 the United States entered into a treaty with Great Britain which obligated the United States to take measures for the preservation of migratory birds and in 1936 a similar treaty was made with Mexico. These agreements have been implemented by the Migratory Bird Treaty Act of July 3, 1918, c. 128, 40 Stat. 755, and the amendatory act of June 20, 1936, c. 634, 49 Stat. 1555.

In conformity with this act of Congress the Virginia legislature has enacted the provisions of Title 29, Chapter 5, Article 3, § 29-81 of which makes it unlawful to hunt migratory waterfowl *in the public waters* of this state from unlicensed blinds and without a season license to hunt. Sections 29-82, 29-83, and 29-87, prescribe the kinds of blinds and how they may be used; § 29-89 allocates the money received from the sale of blind licenses to the game protection fund; § 29-90 provides for both civil and criminal penalties; § 29-91 exempts Accomack, Northampton, York

and Princess Anne counties from the provisions of the article; and § 29-92 authorizes the Commission to alter its provisions wherever "practicable and desirable * * * to meet changing conditions" except that the Commission may not alter the privileges of riparian owners. The most pertinent provisions of the duck blind statutes read as follows:

Code, § 29-85. *"Stationary blinds on shore and in the public waters for owners of riparian rights.—*The owners of riparian rights, their lessees or permittees, who desire to do so, shall, each year, have the exclusive privilege of licensing and erecting blinds on their shore line, and the prior right of licensing and erecting blinds in the public waters in front of such shore line, to shoot waterfowl on or over the public waters, and when such license has been obtained and a stake, or a blind, erected on the site with the metal license plate supplied with the license for that season affixed thereto, no other stationary or floating blind shall locate in the public waters within less than five hundred yards thereof without the consent of such riparian owner, lessee or permittee. Riparian owners, their lessees or permittees, may obtain licenses on and after July first and on or before August thirty-first of each year. A stake, or a blind, shall be erected on the site and the metal license plate supplied with the license for that season affixed thereto within ten days."

Code, § 29-86. *"Stationary blinds in the public waters for nonriparian owners.—*Unless the license has been obtained and a stake, or a blind, erected and marked as aforesaid within the time stated, in any year, the owners of riparian rights, their lessees or permittees, shall forfeit the privilege of licensing blinds on their shores and also priority for licensing stationary blinds in the public waters adjoining such shores. Any locations remaining in the public water shall belong to whoever first obtains license and erects a stake, or a blind, and

cannot be located in water having a greater depth than eight feet at mean high tide, on the site selected, which must be at least five hundred yards from any other stationary blind, with the metal license plate supplied with the license for that season affixed thereto. The license for a stake or brush blind, or other stationary blind permitted by law, in the public waters, may be obtained on and after July first and on or before September thirtieth, and a stake or blind shall be erected on the site with the metal license plate supplied with the license for that season affixed thereto within ten days."

Code, § 29-88. *"Renewing licenses.*—The holders of licenses first issued under this article may renew the same privileges each succeeding year by licensing the same within the time required and placing the metal license tag on the stake or blind as required by this article, provided that the exclusive privileges prescribed with respect to owners and their lessees and permittees in § 29-85 shall be recurrent each year notwithstanding that such privileges were forfeited to some other person or persons in the preceding year. * * *"

The duck blind statutes are a development from the earlier local statutes applicable to several of the counties, such as Princess Anne,[1] Accomack and Northampton,[2] King George, Prince William and Fairfax.[3] More specifically, Acts 1934, page 359, chapter 242, which was local and applied to Westmoreland, Richmond, Lancaster and Northumberland counties was the forerunner of the present code provisions. This act defined the rights of riparian owners, their lessees and licensees in the named counties, thus: "All owners of riparian rights * * * shall, by virtue of said ownership, be first entitled to make a choice of the

---

[1] Acts 1914, p. 716, c. 360; 1928, p. 1009, c. 392; 1936, p. 718, c. 395 (Michie's Code of 1942, § 3305(19c).

[2] Acts 1924, p. 475, c. 312; 1926, p. 656, c. 362.

[3] Acts 1928, p. 880, c. 334.

'set' or position in front of the property of which they are the owners of the riparian rights, * * *" for the purpose of erecting duck blinds, provided they comply with certain conditions. It was repealed by Acts 1936, page 356, chapter 209, (codified as § 3305 (19a) of Michie's Code of 1942), but this act (Acts 1936) followed closely the language of the repealed statute and was of general application; however Accomack, Northampton, and Princess Anne counties were exempt from its provisions. The provisions of the present statutes are substantially the same as those contained in the act of 1936, with slight changes made in Acts 1942, page 54, chapter 59, and Acts 1944, page 157, chapter 128.

In *Commonwealth* v. *Newport News*, 158 Va. 521, 541, 164 S. E. 689, where the power of the state to regulate the use of its waters was upheld, Mr. Justice Epes described the nature and source of the title acquired by the state in the public waters, thus: "When it [Virginia] and the others of the thirteen original States acquired their independence, each acquired not only the powers, prerogatives and rights of the British crown, but also all the powers and rights held by the people collectively in their capacity as sovereign, which were exercised by the parliament as the representative plenipotentiary of them as the sovereign. That is, it acquired full and complete sovereignty, and therewith the full and complete dominion for governmental purposes over all the lands and waters within its territorial limits, and the full and complete proprietary right in all the lands and waters, including tidal waters and their bottoms, within its territorial limits, except to the extent that such proprietary rights had been disposed of by the sovereign State to whose powers and rights it succeeded."

This case discusses at length the "ownership" and "trust" theories of the title of the state in its public waters, but both of these theories are, in their final analysis, expressions "in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an

important resource." *Toomer* v. *Witsell,* 334 U. S. 385, 402, 68 S. Ct. 1156, 92 L. ed. 1460.

This power of the state over its public waters exists even to the extent that the General Assembly, in the absence of any constitutional prohibition on the subject, has the right to "permit or suffer its [Virginia's] tidal waters or their bottoms to be used for purposes which impair or even destroy their use for purposes of fishery, and may lease, or sell to private persons portions of its tidal bottoms with the right to use them for private purposes to the exclusion of the use of the waters thereover for purposes of fishery." *Commonwealth* v. *Newport News, supra,* 158 Va. at page 552.

The only provision of the Constitution of Virginia which contains any specific restriction upon the power of the legislature to dispose of the tidal bottoms of the state and the waters above them is section 175,[4] pertaining to "natural oyster beds, rocks and shoals." *Commonwealth* v. *Newport News, supra.* Therefore, except for this provision, use of the public waters of the state is governed generally by Code, § 62-1,[5] which declares the beds of the bays, the rivers and the creeks, to be the property of the state and that they may be used as a common by the people of the state for hunting and fishing and the catching of oysters and shellfish, subject

---

[4] *"The natural oyster beds.*—The natural oyster beds, rocks and shoals, in the waters of this State shall not be leased, rented or sold, but shall be held in trust for the benefit of the people of this State, subject to such regulations and restrictions as the General Assembly may prescribe, but the General Assembly may, from time to time, define and determine such natural beds, rocks or shoals by survey or otherwise."

[5] *"Ungranted beds of bays, rivers, creeks and shores of the sea to remain in common.*—All the beds of the bays, rivers, creeks, and the shores of the sea within the jurisdiction of this Commonwealth, and not conveyed by special grant or compact according to law, shall continue and remain the property of the Commonwealth of Virginia, and may be used as a common by all the people of the State for the purpose of fishing and fowling, and of taking and catching oysters and other shellfish, subject to the provisions of Title 28, and any future laws that may be passed by the General Assembly. And no grant shall hereafter be issued by the State Librarian to pass any estate or interest of the Commonwealth in any natural oyster bed, rock, or shoal, whether the bed, rock or shoal shall ebb bare or not."

only to such further laws as may be passed by the General Assembly. However, the rights of riparian owners to the low watermark in tidal waters are now well settled. Code, § 62-2;[6] *Miller* v. *Commonwealth*, 159 Va. 924, 166 S. E. 557.

In the exercise of these sovereign proprietary and regulatory rights, the legislature has, in a number of prior acts and in the present statutes, granted to riparian owners, their lessees or permittees, "the exclusive privilege of licensing and erecting blinds on their shore line, and the prior right of licensing and erecting blinds in the public waters in front of such shore line, to shoot waterfowl," and upon their compliance with certain provisions, among which is obtaining a license "on and after July first and on or before August thirty-first of each year," "no other stationary or floating blind shall locate within less than five hundred yards thereof without the consent of such riparian owner, lessee or permittee." If the riparian owners, their lessees or permittees fail to obtain a license within the time stated they "shall forfeit the privilege of licensing blinds on their shores and also priority for licensing stationary blinds in the public waters adjoining such shores" and any locations not thus licensed "shall belong to whoever first obtains license" "on and after July first and on or before September thirtieth" provided such person has otherwise complied with the statutes. The privileges prescribed with respect to the riparian owners, their lessees and permittees "shall be recurrent each year notwithstanding that such privileges were forfeited to some other person or persons in the preceding year."

 Appellants cannot and do not dispute that the state

---

[6] *"Rights of owners to extend to low watermark.—*Subject to the provisions of the preceding section, the limits or bounds of the several tracts of land lying on such bays, rivers, creeks and shores, and the rights and privileges of the owners of such lands, shall extend to low watermark, but no farther, unless where a creek or river, or some part thereof, is comprised within the limits of a lawful survey."

may by license regulate the erection and use of duck blinds. But they challenge the duck blind statutes, and in particular the quoted provisions giving prior rights to riparian owners, as being in violation of the equal protection clause of the 14th Amendment of the Federal Constitution. It is argued that ownership is made the sole ground for the classification in the duck blind statutes and that it is not a sufficient ground for a classification which gives the riparian owner the right to erect duck blinds in the public waters to the exclusion of all others. We are thus presented the issue of whether the classification here involved is unreasonable or arbitrary.

In *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78, 31 S. Ct. 337, 55 L. ed. 369, it was said: "The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality." Moreover, the presumption of reasonableness is with the state. *Salsburg* v. *State of Maryland*, — U. S. —, 74 S. Ct. 280, 98 L. ed. 207.

The General Assembly has the right, subject to the laws of the United States, to regulate the killing of waterfowl from blinds erected in the public waters of this state, so long as it makes no unreasonable or arbitrary classification denying any person the equal protection of the law. In upholding the constitutionality of the Migratory Bird Treaty Act in *Missouri* v. *Holland*, 252 U. S. 416, 434, 40 S. Ct. 382, 64 L. ed. 641, Mr. Justice Holmes was referring to this right when he said: "No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of such birds, but it does not follow that its authority is exclusive of paramount powers. * * * The whole founda-

tion of the States' rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another state, and in a week a thousand miles away."

Our decision as to whether the duck blind statutes create an arbitrary and unreasonable classification will also determine the validity of appellants' further contention that the duck blind statutes are void because in conflict with the Virginia Constitution, and especially § 63 (18), which provides that, "The General Assembly shall not enact any local, special or private law * * * granting to any private corporation, association, or individual any special right, privilege or immunity." In other words, do the provisions of the duck blind statutes, tested by the language of the constitution, grant riparian owners "any special or exclusive right, privilege or immunity" not given to others similarly situated?

In *Dean* v. *Paolicelli*, 194 Va. 219, 227, 72 S. E. (2d) 506, Mr. Justice Miller said: 'The passage of an act by the legislature is a solemn declaration and affirmance by that branch of government of its constitutional power to enact the legislation, and its unconstitutionality must plainly appear before a court can declare it void. *Roanoke* v. *Elliott*, 123 Va. 393, 96 S. E. 819; *Pine* v. *Commonwealth*, 121 Va. 812, 93 S. E. 652. Every reasonable presumption must be indulged and accorded it in favor of its legality. *Willis* v. *Kalmbach*, 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009; * * *."

Law writers and judges have offered many definitions of "special laws," but that given in *Joyner* v. *Centre Motor Co.*, 192 Va. 627, 632, 633, 66 S. E. (2d) 469, has been frequently approved by this court. " 'A law is special in a constitutional sense when by force of an inherent limitation it arbitrarily separates some persons, places or things from those upon which, but for such separation, it would operate.' " * * * "Whether there has been such an 'arbitrary separation * * * must in the nature of things depend upon the person and subject of the particular act and the circumstances and conditions surrounding its passage.' "

It was said in *Bray v. County Board*, 195 Va. 31, 37, 77 S. E. (2d) 479: "The necessity for and the reasonableness of a classification are primarily questions for the legislature. If any state of facts can be reasonably conceived to sustain it, that state of facts at the time the law was enacted must be assumed. *Martin's Ex'rs v. Commonwealth*, 126 Va. at pp. 612-13, 102 S. E. at p. 80; *Joy et al. v. Green*, 194 Va. 1003, 1009, 76 S. E. (2d) 178, 182."

To determine the necessity for and the reasonableness of the classification here made by the legislature, let us determine if any state of facts can be reasonably conceived to sustain it.

It is pertinent to note that the riparian owner has from very early times been recognized to have certain rights, such as the right of ingress and egress from his land to the navigable part of the water, that are not enjoyed by non-riparian owners. In this connection Judge Buchanan said in *Grinels v. Daniel*, 110 Va. 874, 877, 67 S. E. 534: "It is true * * * that the title to the land between low water mark and the line of navigability is in the Commonwealth (*Taylor v. Commonwealth*, 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865, and authorities cited), but it is equally true that between low water mark and the line of navigability the riparian owner has a qualified right." These rights were recognized early in our history and are described in *Darling v. City of Newport News*, 123 Va. 14, 19, 96 S. E. 307, *aff'd*, 249 U. S. 540, 39 S. Ct. 371, 63 L. ed. 759, as "ancient rights of the riparian owners."

In colonial days before the recognition of low watermark as the boundary of the riparian owner's land, the legislature recognized in a series of acts that he should have a prior claim to the waters in front of his lands by forbidding the taking up of "any marshes, swamps, or sunken lands, adjoining to any man's land," until one year's notice had been given to the owner of the adjacent highlands and an opportunity afforded him to take out a patent therefor. See

*Miller* v. *Commonwealth, supra,* 159 Va. at page 936, where a number of these acts are listed.

The duck blind statutes give to the owners of land on the shores of the public waters of this state certain hunting privileges on the waters in front of their lands if exercised by them within the time prescribed, and if they fail to avail themselves of such privileges within the time alloted they pass to others, who may thereafter meet the requirements of the statutes. This is not an absolute or exclusive privilege but a conditional one, which if not exercised results in a forfeiture of the privilege not only of locating a blind in front of his land but also on his shore line. The legislature in making this classification presumably took into consideration the habits of migratory waterfowl and recognized that whether they come to Virginia in the first instance, or return in the future, the length of their stay and their welfare are all largely dependent upon the food which they can get in the fields and marshes of the riparian proprietors. It therefore, probably deemed the preference an essential inducement for riparian owners to furnish feed and sanctuaries such as the refuge established by the federal government in Back Bay of Princess Anne county.[7] Likewise, it may be assumed, the legislature took into consideration the dangers arising from hunting waterfowl on the public waters, a place where others have certain rights, such as navigation, fishing and riparian rights, and provided that stationary blinds be placed in water not deeper than eight feet at mean high tide or closer to each other than 500 yards.

It is therefore not unreasonable to conclude that the provisions of the duck blind statutes were enacted for the conservation of waterfowl, the protection and safety of those engaged in shooting them, and for the promotion of better sport and recreation. The absence of such regulations might lead not only to the destruction and annihilation of migratory waterfowl but also be extremely dangerous and hazardous

---

[7] See *Bailey* v. *Holland,* 126 F. (2d) 317.

to those engaged in such hunting. These provisions were enacted in the exercise of the police power of the state to regulate the killing of waterfowl in the public waters, and in so doing the legislature has offered a limited franchise to all those complying with the provisions therein contained. *Brumley* v. *Grimstead*, 170 Va. 340, 196 S. E. 668; *Boyd* v. *Schaefer*, 184 Md. 621, 42 A. (2d) 721.

Illustrative of the state's power to regulate the use of public waters for such purposes is the case of *Wampler* v. *Le Compte*, 159 Md. 222, 150 A. 455, *aff'd*, 282 U. S. 172, 51 S. Ct. 92, 75 L. ed. 276, holding that a Maryland statute, which gave riparian owners a preference to license blinds in front of their property and also prohibited riparian owners from placing blinds within 250 yards of the lines dividing their properties, without the adjoining owner's consent, did not violate the equal rights of a person who owned less than 500 yards of land fronting on the water and who could not get the consent of his neighbors. In the course of its opinion, the Maryland court said, at 150 A. 457: "The validity of these privileges, revocable at any time by legislative enactment, was recognized by this court in the case of *Sheehy* v. *Thomas*, 155 Md. 688, 142 A. 506; and similar statutes granting like privileges to landowners to use the waters and the bottoms thereunder, in catching fish and in the cultivation and taking of oysters, have also been held valid by this court. *Dean* v. *Slacum*, 149 Md. 578, 132 A. 73."

The privileges granted in the duck blind statutes are similar to those granted under the oyster statutes.[8] Appellants, while admitting the constitutionality of the oyster statutes, attempt to distinguish the two enactments. It is contended that "in the case of oysters, the matter is taken care of by a constitutional provision, whereas the matter of fowling in the public waters remains controlled by Section 62-1, Code of Virginia, 1950, and for this purpose such waters 'may be used as a common by all the people of the

[8] Title 28, Chapter 5, Article 6, Code of 1950.

State for the purpose of \* \* \* fowling \* \* \*.' " As pointed out above, section 175 is the only provision of the Constitution of Virginia which contains any specific restriction upon the power of the legislature to dispose of the tidal bottoms of the state and the waters above them, and that except for this provision, the public waters of the state come under Code, § 62-1, with the right of the legislature to regulate the use thereof, both as to migratory waterfowl and oysters. *Commonwealth* v. *Newport News, supra.* While pointing to Code, § 62-1, the appellants fail to recognize that the very provisions they attack are enactments pursuant to that section. Furthermore, the oyster rental goes into the public treasury while the license fee for duck blinds is paid into the game protection fund, both of which funds are spent for public purposes and uses. Moreover, under the provisions of Code, § 28-123, relating to oysters, it is provided that riparian owners shall have a prior right for the assignment of leases to as much as one half acre of ground in front of their properties, and under Code, §28-124, that non-riparian owners' rights to such leases are subject to the prior rights of the riparian owners. This is precisely the same basis of classification that is used in regard to the licensing of duck blinds.

We cannot say that the classification made in the duck blind statutes, giving riparian owners a preference, is without any foundation; nor that such classification is not germane to the objects and purposes of the law. While we may not wholly agree with the classification in all respects, it does not appear that the classification made is arbitrary and without any reasonable basis.

Appellants further contend that the language, "in front of such shore line," is so vague, contradictory and unworkable as to void the operation of the statutes, and in any event, does not apply to the blind placed by the appellee approximately 500 yards off shore. We have heretofore pointed out that a similar phrase appears in the oyster law, and in the Maryland duck blind statute which was held

constitutional in the *Wampler* case, *supra*. In addition, Mr. Justice Spratley was dealing with a statute[9] in the *Brumley* case, *supra*, which provided for a preference to owners of land "along the shore owned by them," when he said: "To favor the owners of the shores bordering on the public waters in the choice of location along their shore lines, they were given the privilege to procure shore or stationary blind licenses * * *." 170 Va. at page 346. See also *Conner* v. *Hendrix*, 194 Va. 17, 72 S. E. (2d) 259.

The terms of the statute may be difficult to apply under the varying water front conditions and the circumstances involved in each case, but that does not necessarily preclude the courts from clothing them with fairness and equality in keeping with the general purposes of the legislature. Indeed, it is unnecessary and improper in this case to attempt a general statement as to the applicability of the statute under all circumstances. The legislature has apparently attributed qualities of sportsmanship, fairness and common sense to those to whom these provisions apply, without attempting to provide a method capable of precise application to the curvatures and irregularities of shore lines and water frontages commonly found among the creeks, coves and rivers of the duck hunting areas of the state. *Boyd, Wampler* and *Sheehy* cases, *supra*. See also *Councilman* v. *Le Compte*, 179 Md. 427, 21 A. (2d) 535.

The final argument advanced by appellants is that under the duck blind statutes it is possible for riparian owners to completely monopolize the public waters of the state and thereby exclude all others from these waters. The reply to this contention is that the person questioning the constitutionality of a legislative enactment must clearly show that in its operation he has been injured thereby. The fact that it may contravene the constitution in its application to him or others under supposed or different circumstances avails him nothing. *Grosso* v. *Commonwealth*, 177 Va. 830,

---

[9] Acts 1936, p. 718, c. 395.

13 S. E. (2d) 285: *Morgan* v. *Commonwealth*, 168 Va. 731, 191 S. E. 791, 111 A. L. R. 62; *Carpel of Richmond, Inc.* v. *City of Richmond*, 162 Va. 833, 175 S. E. 316. It must be kept in mind that this is not a controversy between two riparian owners or two non-riparian owners, but instead, we are dealing with the rights of a riparian owner and a non-riparian owner to the use of three duck blinds, none of which is attacked as insufficient under the rule that in the application for such license the location must be described with definiteness and certainty. *Brumley* v. *Grimstead, supra.*

If the legislature, by valid enactment, granted to the riparian owner a preference to locate a blind on his shore or in front of his shore line, then in either event Avery's blind, admittedly being within 500 yards of both of Beale's blinds, is subject to the prior right of the riparian owner.

The statutes here assailed do not contravene either the Federal or State Constitutions in the particulars urged by appellants, but on the contrary, are reasonable enactments for the conservation of migratory waterfowl, the promotion of better sport and the protection of hunters and others using the public waters of the state.

*Affirmed.*