# Richmond

CARRIE E. RANEY AND ROBERT W. RANEY v. BARNES LUMBER CORPORATION.

May 3, 1954.

Record No. 4197.

Present, All the Justices.

The opinion states the case.

*W. M. Abbitt* and *J. R. Snoddy, Jr.*, for the appellants.

*Robert Whitehead* and *Robert E. Taylor* for the appellee.

WHITTLE, J., delivered the opinion of the court.

Barnes Lumber Corporation filed a bill in the Circuit Court of Nelson County against Carrie E. Raney and Robert W. Raney, praying for specific performance of an alleged contract to convey timber lands. The case was heard *ore tenus* and on February 19, 1953, a decree was entered holding that the lumber corporation was entitled to the relief prayed for, from which we granted an appeal.

The bill charged that Carrie E. Raney and Robert. W. Raney were seized of the land in controversy containing 4,415 acres, more or less, located in Nelson and Amherst Counties, Virginia; that respondents "by letters, memoranda and other writings signed by them or their agents did on February 19, 1952, consummate negotiations for the sale of said real estate and did then and there agree and enter into a valid, binding contract to sell and convey said real estate to your complainant." The consideration for the alleged sale was $45,000, payable part in cash and the balance on terms. The bill concluded with the statement that respondents had refused to comply with the agreement and with the prayer for its specific performance.

Robert W. Raney answered the bill, admitting that he was the legal owner of a one-half undivided interest in the land. He asserted, however, that he "has made no contract for the sale of his property to the plaintiff, by writing or otherwise, and that he has not authorized anyone to contract for the sale of his one-half interest in said land to the plaintiff"; that so far as he was concerned, Barnes Lumber Corporation had no contract with him for the sale of his interest in the property.

Carrie E. Raney filed her separate answer to the bill. She admitted owning "a one-half undivided interest" in the land, with her son Robert W. Raney owning the other one-half; she asserted that Barnes Lumber Corporation was on February 13, 1952, and for a long time prior thereto, fully cognizant of the true status of the title and ownership of the land. She further asserted that her offer to sell the land as evidenced by her letter of February 13, 1952, was subject and "conditioned to the approval of Robert W. Raney, the other co-owner of said real estate." She denied that Barnes Lumber Corporation had any contract for the sale of the land from the owners as the consent and approval of Robert W. Raney had never been secured.

Upon the filing of the answer of Mrs. Raney the corporation filed a paper designed as a "bill of particulars" in which it notified the Raneys that it intended to rely upon certain documentary evidence such as letters, telegrams and other documentary proof to establish its claim. It was stated that the paper was being filed at the request of the respondents, "without an order of court". The "bill of particulars" concluded: "In the event the court should hold * * * that the said Carrie E. Raney is seized as a tenant in common of any undivided interest therein, complainant prays that the said Carrie E. Raney may be required to specifically perform said agreement as to her undivided interest and convey the same unto the complainant upon the payment by it to her of the duly proportionate part of the agreed purchase price." This pleading will be discussed later.

After the filing of the "bill of particulars" Mrs. Raney filed an amended answer in which she charged that the price of $45,000 offered by the corporation was "grossly inadequate to such an extent as to completely shock the conscience" of the chancellor; that the value of the property was far in excess of the amount offered. She further asserted that her entire life had been spent in California and North Dakota; that she had only visited Virginia on one occasion twenty or more years ago; and that she had no knowledge of the character of the property or the value of the timber thereon.

After the hearing, as aforesaid, the court decreed specific performance of the contract.

Seven assignments of error were filed to the entry of the decree. These assignments present three questions for consideration which will be treated in the order of their relative importance.

The first question is: Was Carrie E. Raney authorized by Robert W. Raney to act as his agent in the sale of his interest in the property, and if not, did he ratify the alleged sale made by her to Barnes Lumber Corporation?

The record discloses that Carrie E. Raney, a resident of Morgan Hill, California, is the mother of Robert W. Raney, who lives in North Dakota. The land in controversy was conveyed to Carrie E. Raney and Robert W. Raney "and the survivor of them" by deed dated March 26, 1934, from A. N. Raney, husband of Mrs. Raney and father of Robert. The deed concluded "in the case of the death of either grantee his or her interest shall revert and pass to the survivor". There were three sons and two daughters in the Raney family, widely separated; one son, Edwin Raney, lived in Drayton, North Dakota, not far from the home of Robert W. Raney, who lived near Drayton; the third son, Rev. William Raney, lived at Oceana, Princess Anne County, Virginia; and the two daughters lived with their mother in California.

Barnes Lumber Corporation, whose principal office is located in Charlottesville, Virginia, is engaged in the manufacture of lumber. It desired to acquire the 4415 acres of land

for the valuable timber thereon. The corporate officers had known of this timber land for many years, and on June 2, 1949, wrote Robert Raney a letter asking if he would be interested in selling. Robert Raney replied on June 11, 1949: "In reply to your letter of June 2, I am forwarding your letter to my mother, Mrs. A. N. Raney, Morgan Hill, California. I believe she may be interested in selling."

On June 16, 1949, the corporation wrote Mrs. Raney, telling her of its correspondence with Robert in which letter it was stated "* * * We wish to say again that we would be interested in purchasing the timber", or both the land and timber. On June 27, 1949, Mrs. Raney replied that she had "not been able to contact one of our sons yet so cannot tell you definitely whether we could sell the property. * * * If you could talk with our son, William, it might be more satisfactory than writing." Accordingly, Bennett H. Barnes, Jr., an officer of the corporation, contacted the Rev. William Raney and viewed the property with him. On July 7, 1949, the corporation wrote Mrs. Raney that it was still interested in purchasing the property, and that it would prefer buying the land rather than the timber alone. On August 3, 1949, Mrs. Raney replied that there was a possibility they would sell, and that "we would like you to make an offer if you still wish to buy it".

Bennett Barnes, Jr., made a cruise of the property and wrote Mrs. Raney on October 21, 1949, mentioning fire and other damage to the property, and a conference in person was suggested. A copy of this letter was sent to Robert and William Raney. Bennett Barnes, Sr., and his son, went to California on February 10, 1950, and interviewed Mrs. Raney. The elder Barnes testified that this interview resulted in an offer on the corporation's part to purchase the property for the sum of $25,000, which offer was accepted by Mrs. Raney. Barnes also testified that Mrs. Raney made the statement that whatever she did would be satisfactory to Robert. The corporation asserted in its brief that the elder Barnes and his son left California believing that they had contracted to purchase

the property, and that the title was examined and a deed prepared and sent to Mrs. Raney with instructions as to consummating the transaction.

It will be observed that up to this point Robert W. Raney, the owner of a one-half interest, had in no way committed himself to sell at any price, nor had an agency been established whereby he had authorized his mother to act for him in the sale of the property.

On February 21, 1950, Mrs. Raney wrote the corporation: "Rec'd. your letter containing deed, instructions, etc. We will mail it to Robt. and Edwin. I expect them to decide whether to sell or not. I do not feel that I can take the responsibility * * *." Later, on March 13, 1950, the corporation wrote Mrs. Raney: "* * * we took the liberty of calling on you and making you the $25,000 offer on February 10th, which we understood *in so far as you were concerned* was acceptable to you. * * * Off and on for a good many years we have spent considerable time and money trying to purchase your property and felt that we finally had done so, however, * * * if you do not care to see (*sic*) it based on what has transpired between us, then there is nothing else left for us to do but to say we are sorry and hope for better luck next time, feeling quite sure you will give us preference should you care to negotiate again at some future date." (Italics supplied) Robert W. Raney had refused to sign the deed and it was returned to the corporation unexecuted on May 1, 1950.

The last above quoted extract from the corporation's letter clearly demonstrated that the $25,000 deal had been called off. The reason for the termination was that Robert W. Raney was not willing to sell his one-half undivided interest.

It is evident that when the corporation received an abstract of title to the property it then learned, if it did not know before, who the owners were and what their interests were. It was charged with knowledge that a price agreeable to both owners would have to be arrived at before the property could be acquired. The letter from Mrs. Raney of February 21, 1950, was direct notice that Mrs. Raney would not undertake

to price the property even if she had such right. The letter stated in explicit terms, "I expect them (Robert and Edwin) to decide whether to sell or not. I do not feel that I can take the responsibility."

It is not clear what interest the Raney children other than Robert had in the property, unless it was the natural interest of children trying to advise with and aid their mother. So far as the record title is concerned, the only parties owning an interest are the respondents, Mrs. Raney and Robert. There is no other proprietary interest disclosed.

On April 6, 1950, the corporation wrote Mrs. Raney, raising its $25,000 offer to $30,000, "provided the transaction can be closed by the 20th of this month". This letter also stated that "if this revised higher offer is not acceptable then since you say you will sell the timber we also would be willing to pay you a good price for the standing timber only." The revised offer was not acceptable.

Other correspondence ensued between the corporation and Mrs. Raney. On November 22, 1951, Mrs. Raney wrote: "Rec'd. your letter of Nov. 15. I had left it to the boys in N. D. to sell the land or do something with it but since they have done absolutely nothing I'm not very pleased about it. They did not want me to sell. * * * If you will give me your price on the property *I will try and get in touch with the children.* I know that two would like to sell but that is not a majority." (Italics supplied)

After further correspondence, on February 7, 1952, Mrs. Raney wrote the corporation asking it to submit the best offer it would care to make for the property if it was still interested in buying. Upon receipt of this letter the corporation both wired and wrote Mrs. Raney asking her to quote her best price on the property. On February 13, 1952, Mrs. Raney replied: "Rec'd. your wire and in reply would say that we think we should sell the Va. property for $45,000. If you accept this offer I would appreciate it if the amount could be broken up in some way so the income tax would not be too big for me. I expect the family to share it with me."

This letter is the basis of the suit against Carrie E. Raney and Robert W. Raney.

The lumber corporation wired Mrs. Raney immediately: "Your letter 13th accept your offer $45,000 stop We are ready to pay entire amount in cash or any other way that you desire stop It might be better for you to have non-interest bearing payments split up over a period of seven years say $10,000 cash balance $5,000.00 per year until fully paid stop Suggest you take up with your attorney *and sons* regards payments letting us know immediately whether or not you want us to have papers prepared." (Italics supplied)

Upon receipt of this telegram Mrs. Raney attempted to secure a deed from Robert W. Raney and his wife conveying to her his one-half interest in the property. She employed Harold Holden, Esquire, Attorney at Law, Morgan Hill, California, who wrote the corporation on February 21, 1952, that Mrs. Raney was "in the process of obtaining a deed to the real property you are interested in in Virginia from her son. It will probably be several days before she gets it. She said she would advise you."

On February 28, 1952, Robert W. Raney and Edwin Raney jointly addressed a letter to the corporation reading: "Robert received a deed from mother's attorney to be signed by him transferring the title all to mother's name so that she could make a sale of the property to you folks for $45,000.00. I have always considered the Virginia property worth more than you folks have been offering. We have an offer of $75,000.00 for this property now, and not wanting to be playing one of you against the other to get a higher bid for the property, and that you have been trying to purchase this property for the past two years, we have sent the signed deed to mother's attorney to be held till they hear from you in regards to this offer, *as I don't think that you would be interested in purchasing a half interest in the property.* We asked for a ten day period before answering this other offer, if you folks are interested in purchasing for $75,000.00 mother and her attorney can complete the transaction from Morgan

Hill, Calif." (Italics supplied) A copy of this letter was sent to Mrs. Raney and her attorney.

On March 5, 1952, Mrs. Raney received a telegram from the corporation requesting her to wire it "when and how deed to Virginia property will be delivered". Mrs. Raney delivered this telegram to her attorney for answer, and he wrote the corporation on March 5, 1952, "* * * I wrote you under date of February 21 stating that Mrs. Raney was in the process of obtaining a deed to the property from her son. I received the deed from her son with instructions to make delivery only in the event of the payment of $75,000.00. As you know Mrs. Raney has only a one-half interest in the property. Her son, Robert Raney, has owned an undivided one-half interest with her since the 26th of March, 1934. When Mrs. Raney offered to sell to you for $45,000.00 it was, of course, conditioned upon her being able to obtain a deed from her son covering his half interest. Mrs. Raney is willing to sell, but her son is not willing to sell at the price offered. You might communicate further with Robert Raney at Drayton, North Dakota."

On March 5, 1952, the corporation notified Mrs. Raney by letter, "* * * on advice of our counsel we instituted a suit * * * to compel performance of the contract to sell the real estate. * * * It is our hope that this transaction can be consummated without further delay and extended litigation." This letter apparently ended the correspondence between the parties.

The correspondence shows two active attempts on the part of the corporation to purchase the property, the first emanating from the recounted visit to California where it was asserted that Mrs. Raney agreed to sell the property for $25,000, which figure was later raised to $30,000. This alleged sale fell through because Robert refused to sign the deed.

It is contended by the corporation that Robert Raney's letter to it under date of June 11, 1949, was an indication on his part that his mother could act as his agent. The letter

stated that Robert was forwarding the corporation's letter to him under date of June 2, 1949, to Mrs. Raney as "I believe she may be interested in selling". Clearly, any supposed agency thus allegedly created was annulled by the refusal of Robert to sign the deed for the $25,000 consideration. Such refusal to sign was proof positive that Robert would not be bound by anyone other than himself, and that he would do his own trading. In addition to this, Mrs. Raney notified the corporation on February 21, 1950, when she mailed the deed to Robert, that she expected them (Robert and Edwin) to decide whether to sell or not, that "I do not feel that I can take the responsibility". No suit was instituted by the corporation to enforce specific performance of this alleged contract although it was claimed that Mrs. Raney verbally stated that whatever she did would be satisfactory to Robert. Instead of suing, the corporation abandoned the deal by writing Mrs. Raney that it would "hope for better luck next time". Since the abandonment of the $25,000 deal there has been no written or spoken word from Robert which would indicate that he had authorized anyone to act for him regarding the sale of his interest.

When the second attempt to purchase the land was made and Mrs. Raney's offer to sell for $45,000 was accepted by the corporation, Robert steadfastly refused to be bound. The deed conveying his interest in the land to his mother was mailed to her attorney with explicit instructions that it be not delivered until she had in hand $75,000, which was the least amount he was willing to sell for. He sent the corporation a letter outlining his reasons for not accepting the $45,000 offer, and in addition, he wired it on March 3, 1952: "Not interested in your offer of $45,000.00 for Virginia property. * * *"

We recognize the rule that the conclusion of a trial judge after an *ore tenus* hearing on questions of fact is entitled to great weight and that his judgment on the evidence should not be disturbed unless it is plainly wrong. § 8-491, Virginia Code, 1950; *Brumfield* v. *Brumfield* (1953), 194 Va.

577, 580, 74 S. E. (2d) 170, 172. An important reason for this rule is that the trial judge has seen the witnesses, heard them testify, and has observed their demeanor on the stand, and should thus be in a better position to evaluate the testimony. The logic from which the rule emanates does not apply here. In the instant case all evidence having probative value consists of the letters and telegrams interchanged between Mrs. Raney living in California, the Barnes Lumber Corporation located in Virginia, and Robert W. Raney in North Dakota. The oral testimony presented before the lower court simply amplifies the fact that so far as Robert W. Raney was concerned he was attending to his own business and had not authorized or empowered any agent to act for him.

Agency has been defined as the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act. See Restatement Agency, § 1 (American Law Institute). The law indulges no presumption that an agency exists. On the contrary one is legally presumed to be acting for himself and not as the agent of another. *Montague Mfg. Co.* v. *Aycock-Holly Lumber Co.*, 139 Va. 742, 747, 124 S. E. 208; *Brumley, et al.* v. *Grimstead*, 170 Va. 340, 358, 196 S. E. 668. The burden falls upon him who alleges an agency to prove it. *Barnes* v. *Hampton*, 149 Va. 740, 743, 141 S. E. 836.

It will be remembered that the bill in this case charged that Mrs. Raney and Robert W. Raney "by letters, memoranda and other writings signed by them or their agents did on February 19, 1952" consummate negotiations for the sale of the real estate, etc. There is no evidence in the case showing that Robert W. Raney ever signed any letter, memoranda or other writing conveying or agreeing to convey his one-half undivided interest in the land to the lumber company, and it is nowhere shown that he either expressly or by implication authorized anyone else to make the sale for him. In fact, the proof is to the contrary.

It is next argued that if Robert did not authorize his mother to make the sale, he ratified her acts by signing the deed purporting to convey his interest to her. The evidence shows the fallacy of this argument. As aforesaid, the deed so signed was delivered to Mrs. Raney's attorney in escrow, to be held by him until $75,000 was paid, this being the minimum price he would accept.

When specific performance of a contract is sought, where the same is alleged to have been made by an agent, such agency must be established by clear, certain and specific proof, and the proof must be equally clear and satisfactory to show the ratification of the contract by the principal where ratification is claimed. To hold otherwise would inequitably require the enforcement or ratification of the contract, and equity will not decree specific performance or sustain the claim of ratification when it would be inequitable to do so. *Halsey* v. *Monteiro*, 92 Va. 581, 24 S. E. 258. A bare preponderance of the evidence is not sufficient. "The proof must be so clear and distinct that a fair and candid person can see, without hesitation, that the alleged authority was given." *Simmons* v. *Kramer*, 88 Va. 411, 412, 13 S. E. 902; 17 M. J., Specific Performance, § 12, p. 21.

The corporation's argument that agency can be presumed under the facts of this case because of the mother and son relationship is without merit. Kinship does not imply agency, and no presumption arises merely from such relationship. *Blair* v. *Broadwater*, 121 Va. 301, 93 S. E. 632; *Goff* v. *Lowe*, 101 W.Va. 57, 131 S. E. 870; 1 M.J., Agency, § 111, pp. 349, 350.

The related course of dealings between the parties clearly demonstrates that the court below erred in declaring specific performance in so far as Robert W. Raney's interest is concerned.

Having thus disposed of the interest of Robert W. Raney, it is only necessary for us to consider the remaining assignments of error as they relate to the rights of Mrs. Raney. She asserted that the court erred in decreeing specific per-

formance because of the inadequacy of price. It is true that the corporation well knew the value of the property since its officers were experienced lumbermen and were familiar with the land. The boundary had been cruised by them and the footage in lumber estimated. It is equally evident that Mrs. Raney had no idea of the value of the property. She lived in California and had only visited Virginia on one occasion. However, there is scant evidence in the record to show that the price was inadequate. Even if we assume inadequacy of consideration this would be no ground for refusing specific performance unless so gross as to be demonstrative of fraud. Minor on Real Property (Ribble), 2nd Ed., Vol. 2, § 1088, p. 1436; 17 M.J., Specific Performance, § 17, p. 29. We therefore conclude that this assignment is without merit.

■ Barnes Lumber Corporation finally poses this question: "If this court holds that Carrie E. Raney was not authorized by Robert W. Raney to offer the property for sale and that he did not ratify her offer to appellee, is appellee entitled to specific performance of the contract of sale as to the undivided interest of Carrie E. Raney in said real estate with a proportionate abatement of the agreed purchase price?"

It will be remembered that the corporation filed a "bill of particulars", without order of court. The last paragraph of the "bill of particulars", a pleading properly employed only in actions at law (Rules of Court 3:7 and 3:18) stated that while the bill of complaint prayed that the defendants, Carrie E. Raney and Robert W. Raney, be required to specifically perform the contract of sale for $45,000, if the court held that Mrs. Raney was not authorized by Robert "to enter into said agreement as to his interest * * * and that the said Carrie E. Raney is seized as a tenant in common of an undivided interest therein, complainant prays" that she be required to specifically perform said agreement as to her interest upon the payment of the consideration due her for such interest.

The bill of complaint, as aforesaid, was filed on March 4, 1952, and eight months later, on November 6, 1952, on the corporation's motion, the court ordered it amended so as to

include the above recited last paragraph of the "bill of particulars". In view of the lower court's ruling that the contract be specifically enforced against both Mrs. Raney and her son, it was not necessary for it to consider this question.

As aforesaid, the deed from A. N. Raney conveyed the property to his wife and son "and the survivor of them", and it concluded, "it is distinctly understood and agreed between the parties hereto that in case of the death of one of the grantees herein named, his or her interest herein conveyed shall revert and pass to the other grantee. * * *" It is conceded by both sides in their briefs "that Carrie E. Raney and Robert W. Raney are joint tenants with the common law right of survivorship".

The corporation contends that Mrs. Raney "is bound under her contract as to her undivided one-half interest in the property, (that) said contract converted the tenancy from a joint tenancy to a tenancy in common", and that appellee is entitled to specific performance as to Mrs. Raney's "undivided one-half interest therein as tenant in common upon the payment by it of one-half the purchase price". On the other hand Mrs. Raney contends that the only interest she could dispose of would be her interest in the property, that she could not by her sole act change or affect the right of survivorship as provided in the deed. The corporation, in effect, says that if we will hold that Mrs. Raney is a tenant in common with her son, and if we will specifically enforce the contract against her interest, it will take title to the same, but it does not want Mrs. Raney's interest with strings attached.

As we view the case, however, it is not necessary for us to decide Mrs. Raney's interest in the land. The original basis of this suit was that Mrs. Raney had been authorized by her son to act as his agent for the purpose of selling the entire property including both the timber and the land. Nowhere in the negotiations was it ever suggested that the corporation was attempting to purchase only Mrs. Raney's interest, whatever that might be. This theory came into the case by the amendment to the original bill of complaint. There is not a

word in the mass of correspondence between the parties which would indicate that either the corporation or Mrs. Raney ever had in contemplation dealing as to a one-half interest. Mrs. Raney's offer to sell the land for $45,000 contemplated the sale of the fee simple title to the whole, conditioned upon her ability to satisfy Robert as to the consideration. Robert wrote the corporation on February 28, 1952, when he declined the $45,000 offer and made the counter offer to sell for $75,000, "I don't think that you would be interested in purchasing a half interest in the property". The corporation never replied to this letter.

Specific performance of a contract is not a matter of absolute right; it rests in a sound judicial discretion. *Griscom* v. *Childress*, 183 Va. 42, 31 S. E. (2d) 309. In such suits courts have and exercise a wide discretion. 17 M.J., Specific Performance, § 4, pp. 8, 9.

As heretofore stated, the record shows that the corporation never contemplated purchasing other than the whole of the property and Mrs. Raney never intended to sell less than the whole. Under such circumstances it would be inequitable to specifically enforce the alleged contract.

For the reasons stated, the decree of the lower court ordering specific performance is reversed and annulled, and a decree will be here entered dismissing the original bill of complaint and the amendment thereto.

*Reversed and dismissed.*